Abdulaziz v. McKinsey. Thank you, Judge. Good morning, Your Honor, Your Honors. My name is John Olson and I represent Plaintiff Appellant Omar Abdulaziz in this case. We filed our reply brief. We used a hypothetical and the hypothetical concerned a serial killer, the Texas Chainsaw Massacre. Wasn't my idea when California counsel was a horror fan, a horror film fan, but I'd like to switch it up for the court this morning. Since we filed our responsive brief in February, there have been a number of mass shootings. Buffalo, New York, Evalde, Texas, Philadelphia, Pennsylvania. I could go on. But after these shootings, the discussion is always the same. How did the shooter get the gun or buy the ammo? And in most cases, the answer is he didn't tell the gun owner, he didn't tell the gun shop what he was doing. And when the gun shop ran the background check, there were no red flags. So they were perfectly okay to sell that shooter the gun or the ammo that he needed. But what if the shooter in the Buffalo incident in New York told the gun shop, he said, I went to the top market yesterday. I checked it out. I'm ready to go. All I need from you is a gun and some ammo. In that situation, all the gun owner had to do was say, no, I'm not going to sell you the gun or the ammo. And then hopefully he would call the police. If the gun shop owner proceeded anyway, he would have a duty to the people in the market. And that duty is to not sell the gun or whatever it is that shooter needed. He didn't have a duty to control that shooter. He had a duty to control his own actions and his own shop. And that duty was, no, you're going to use these guns and the bullets to do harm. I can't sell them to you. It's not asking for much. There are no cases directly on point, but there are cases of landowners. If a lock is broken and thieves are getting in, the landowner has to fix the lock. Security camera is broken, the landowner has to fix the security camera. Doesn't the complaint have some allegations that suggest that your client had been targeted for persecution long before the slide deck was created? Yes, there's no doubt about that. He actually applied for asylum in Canada. But what happened once that slide deck was prepared and reported was that he went from one of thousands of dissidents that are criticizing the Kingdom of Saudi Arabia and MBS, Mohammed bin Salman, to one of three. That McKinsey report says these are the three, I think the word it uses is most influential. And then we can show that once that report was prepared, that the activity ratcheted up. His family was not harassed before that report was prepared. His brothers were not arrested. One brother did not comfortable. We are confident that we can show that report was a trigger that started an additional campaign against Mr. Abdul Abziz. Are you asking us to find a duty not to publish private information? No, it's not private information. And I think McKinsey will tell you what it was, was a distillation of public information. Now, if you read the report, there were 516 million registered Twitter users in Saudi Arabia. They generate 500,000 tweets a day. Now McKinsey, using its resources and the 75,000 tweets about the austerity project on this date. And then this is how active, this is how Saudi nationals responded. They retweeted, they liked. So what's the duty that you're asking us to find? How would you articulate, how would you describe the duty not to publish individualized information? No, the duty not to identify. Isn't that a harder duty to establish in law than the duty that my colleague began with? It's not the duty not to publish private information. It's the duty not to republish or public information, right? If I'm understanding it. I think so. But the way I look at it, and it comes back to my mass shooting analysis. No, McKinsey didn't need guns and ammo. Not McKinsey, I'm sorry. KSA and MBS did not need guns and the ammo. What they needed was someone to take all this information that's out there and distill it and identify, in this case, the three major influencers. That's what we're saying McKinsey should not have done. And if you look at the response to the New York Times report, they pretty much say that. They say, this normally shouldn't have happened. We normally don't do this. We're shocked and horrified. And we're going to get to the bottom of it. We don't know exactly what happened with that investigation, but we do know they drafted the report. So they recognize that, that this should not have been done. They should not have found these three guys. And out of the three, as far as we know, Omar Abdulaziz is the only guy that is still relatively free in Canada. Now, we do cite the law and duty in New York in our brief. We have Palsgraf, Palka, Stevens, Stagel. But we really don't disagree, I don't think, on what the New York law is on duty. McKinsey, in its brief, cites Eisenman. And Eisenman, at page 175, while moral and logical judgments are significant components of the analysis, courts are also bound to consider the larger social consequences of their decisions and to tailor their notion of duty so that the legal consequences of wrongs are limited to a controllable degree. And again, that's, don't provide the tools to the bad actor. Don't provide the guns. Don't provide the ammo. Don't, don't provide the information. On causation, what are your allegations of causation? Like, where is that in the complaint? The causation allegations are... You can maybe just describe it and tell us later, but like... Yes. What's the connection between the report and the injury as alleged? What the allegation is, generally, is that as a result of the report, the efforts to silence these three gentlemen, my client in particular, were ratcheted up. We can't deny that he was... As a result of the report. As a result of the report, right. What does that mean? The report was, enabled KSA and NBS to focus their efforts on, and we believe it was prepared for that purpose, to allow them to focus their efforts on specific critics that were, that were influential, the most influential, as it says in the report. And as a result of that, the family was tortured by proxies, what it's called. The family was taken into custody. The brothers are still in jail and they have been tortured. Friends and family have also been tortured and detained and travel restrictions. So the report allowed KSA and NBS to focus on these three individuals. That's the allegations in the complaint. Thank you. Thank you, Your Honor. It may please the court. Joseph Palmore for McKinsey. The complaint here fails for two fundamental black letter reasons. One, there's no legally cognizable duty. And two, there's no adequate allegation of proximate cause. Turning first to duty, black letter New York law is clear that the question of duty is a threshold one in any negligence case, and it's a question for the court. And here there is no relevant duty. At page nine of his reply brief, and again today, counsel says he's not asking for the creation of a new duty. So he needs to find an analogous one under New York law. And there simply isn't one. With respect to the provision of the report itself, New York doesn't have a privacy tort. And it has a very narrowly drawn statutory privacy protection, which is there's no claim here under that statute. And so there's simply the provision of information. Even private information wouldn't violate any duty in New York. And of course, this, as the court's questions reflect, was a distillation of very public information, social media activity sent out to hundreds of thousands of people. It did change the, I mean, it did add something to the mix, though. The analysis of the Twitter feed and the identification of this individual as being influential and handing that to a repressive government, it's certainly perceivable if those are all the truthful, if those allegations are shown at trial, that harm would result, right? Your Honor, and that is the, that question gets at the, I really think what the fundamental argument on the other side is, which is that foreseeability creates a duty. And that, as a proposition that's been rejected over and over again in the New York courts, the Polka case, that's what the dissent said, giving the same reading of that one sentence from Paul's graph. And the majority said, no, that foreseeability does not create a duty. It can cut back on or affect the scope of a duty, but the duty has to be created elsewhere. Well, isn't there like a duty to exercise reasonable care not to harm strangers? No, Your Honor, with respect to conduct by a third party, which is what we're talking about here, we're talking about wrongful conduct by a third party, a sovereign nation, there can be liability and a duty only in very narrowly drawn circumstances based on relationships. So if the defendant had actual or, and legal authority over the third party, so if you think master, servant, parent, child, then yes, there can be liability. Page six of the reply brief, that's disavowed. Everyone knows that McKinsey didn't control the Kingdom of Saudi Arabia. There can also sometimes be liability if there was a special relationship between the defendant and the plaintiff. And that's what some of the cases that my friend on the other side was talking about. These are cases where a property owner may have certain duties to protect guests on the property from the actions of other guests. That's very narrowly drawn. But when you get to a situation like this, outside of one of those special relationships, New York law is abundantly clear that there is no liability for a defendant based on harm allegedly caused by a third party. And there are numerous cases on that. The best ones are the ones I'd point the court to would be Vega, which is the text case where the girlfriend is texting the boyfriend who crashes. She's not liable even though she knew that she was distracting him and it was foreseeable. Malone is a case where a doctor was prescribing narcotics to someone. The allegation was that he knew this person was an addict and he then went in and killed someone in a robbery. The doctor's not liable. And Hamilton is another case where the allegation was that the sale of a dangerous product that the seller was, if it was foreseeable that the product would be misused, that they could be liable. And the New York Court of Appeals said, no, foreseeability isn't enough absent a relationship. There is no duty. And to go to some of the hypotheticals that were raised in the brief and by my friend during oral argument, intentional torts take care of all the kind of the troublesome hypotheticals here, right? If someone says, give me a gun because I'm going to go kill someone with it, then you're going to be liable for a battery or wrongful death, intentional infliction of emotional distress. If you intend to help that person, you know that. But there are no intentional tort claims here on appeal. There were in the district court. They were dismissed as time barred. They had other flaws as well that we identified in our briefing below. And plaintiff chose not to appeal the dismissal of the intentional torts. So here, all we have is a negligence claim. So tell us what the purpose of was of this report identifying, quote, major influencers in sortie driving discussion regarding austerity measures. I think where the suggestion here is that it was a list for hit jobs in effect. What was the purpose of this identification of major influencers? Well, your honor, the record here is limited, but what the record shows is that this report was created for internal purposes. It was not created at the request of the Kingdom of Saudi Arabia. The allegation on the other side is that- Internal to whom? To McKinsey. And if you look at the- McKinsey apparently always claims that everything it does is internal to it, right? No, your honor. Often McKinsey does provide reports to clients, but this report was created for internal purposes. And if you look at the report as a whole, not just this one slide, it's talking about overall what is the kind of public sentiment on austerity measures. We're talking about like, you know, tuition, toll roads, things like- Did this report ever get to the Saudis, the Saudi regime? The allegation in the complaint is that it did. We don't think that it did. But we can stipulate for purposes of the legal issues on appeal. We don't have to fight that, okay? So we can assume that it did, even though we don't think it did. Well, explain to us what the purpose of this report would be, even if it's internal. What's the purpose? What purpose did it serve McKinsey in this case to know who the major influencers and Saudi that drove the discussion regarding austerity measures? Your Honor, the record doesn't disclose that. We're in a 12B6 posture. I understand. Yes, and I don't have independent knowledge outside of the record on that, other than it was created for internal purposes. It was not created for any client. It was not given to any client. They have a fascination with the political science of Saudi Arabia. Your Honor, McKinsey obviously has an office in Saudi Arabia. This is a client. It has people on the ground there. So it wouldn't be surprising that they would do an analysis like this for internal purposes. But again, even if it had been actually commissioned, it wouldn't change the legal issues on appeal. If it had been commissioned and conveyed to the Saudi regime, do you think that it still would not meet the test of the 12B6? I don't, Your Honor, because the provision itself doesn't violate any duty. There's no privacy tort in New York. And of course, this is public information. There would be serious First Amendment problems with prescribing the provision of public information like this. And second, there is no duty under New York law to control the conduct of third parties, again, absent a special relationship, which is entirely absent here. The court asked some questions about the second ground for dismissal, which we've argued on appeal, which is causation. And I think that is a separate fundamental defect. As by the plaintiff's own account, he began criticizing the kingdom on social media in 2009 when he moved to Canada. He actually got asylum in Canada in 2013 because he had a credible fear of persecution. He showed that and got asylum from the government of Canada in 2013. And so what he would need to show was that he would need to plausibly allege that it's more likely than not that the distillation of his social media activity is what caused him harm as opposed to the social media activity itself, which by his own allegations, the Saudi government was already quite well aware of. And that doesn't meet the kind of basic proximate cause requirements. There was also a gap in time between the preparation of the report in December 2016 and what he alleges was sub-follow-on harm that happened in 2018. With respect to harm to his family members, that's something he can't recover for under New York law. Unless the court has any other questions, I would ask that the judgment be affirmed. Thank you, Judge. I'd first like to address a point that Judge Cabranes made. What was the purpose of the report? And we hear that it was an internal report. But in October of 2018, the New York Times wrote an article and they had a copy of the report. So if it was internal, somehow it leaked and it got published by the New York Times. And the only other point that I'd like to address on rebuttal is the causation point that's been raised by the court and by my friend. And there was no cross-appeal here. And the two opinions that Judge Schofield wrote, in one she had a footnote that said there's no causation. But in both opinions, she directed us, she directed Omar to amend his complaint to deal with the duty. She didn't say amend your complaint and deal with the causation. And when she issued her second opinion denying the motion to file an amended complaint, she said denying it because there is no duty. So if the court should find that this complaint does not have the requisite allegations of causation, we'd ask that that Mr. Abdulaziz be allowed to amend the complaint appropriately. And unless the court has any questions, that's all I have. Thank you both. Thank you. We'll take the matter under advisement.